IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADOBE SYSTEMS INCORPORATED,<br><br>    Plaintiff,<br><br>  v.<br><br>HOOPS ENTERPRISE LLC; and ANTHONY KORNRUMPF,<br><br>    Defendants.<br>_____/<br>AND ALL RELATED CLAIMS<br>_____/ | No. C 10-2769 CW<br><br>ORDER GRANTING PARTIAL SUMMARY JUDGMENT |

    On June 1, 2012, the Court converted Plaintiff Adobe Systems Incorporated's first motion in limine, addressing the defense raised by Defendants Anthony Kornrumpf and Hoops Enterprise LLC that the prior settlement agreement between the parties granted Defendants permission to sell OEM software outside of the license terms, into a motion for partial summary judgment under Federal Rule of Civil Procedure 56. At that time, the Court allowed the parties an opportunity to submit additional briefs and evidence addressing the motion for partial summary judgment. Defendants subsequently filed a supplemental opposition to Adobe's motion. Having considered the papers filed by the parties, the Court GRANTS Adobe's motion.

BACKGROUND

    Adobe distributes its software products pursuant to different types of licenses. One type of such software is "academic or educational product ('EDU' product)," which "is priced

considerably lower than retail for those who are students or otherwise affiliated with educational institutions." Coombs Decl. in Supp. of First Mot. for Partial Summ. J. ¶ 2, Ex. A (Stickle Decl.) ¶ 6.  Another type of restricted software licensed by Adobe is Original Equipment Manufacturer (OEM) products, which are distributed in a bundle with approved hardware components. Id. at ¶ 7; see also Kornrumpf Decl. in Supp. of Defs.' Mot. for Preliminary Inj. ¶ 2 (acknowledging that "OEM software is intended to be included with a hardware component").  The bundles are product-specific and Adobe's product may not be unbundled and sold separately or re-bundled with products not previously approved by Adobe.  Stickle Decl. ¶ 7.

In an earlier related case, Adobe Systems LLC v. Kornrumpf, Case No. 08-5513 CW (N.D. Cal.), Adobe brought claims for copyright and trademark infringement against Defendant Anthony Kornrumpf alleging that he distributed unauthorized copies of Adobe's software.  That action was resolved by way of a settlement agreement between the parties, and the Court entered a stipulated permanent injunction. See Case No. 08-5513, Docket No. 27.

The settlement agreement, which was executed on July 10, 2009, stated that the parties entered into it to settle the action amicably and avoid the risk and expense of future litigation. Settlement Agreement, 1.[1]  It provided that Adobe could file a stipulated judgment holding Kornrumpf liable for one million dollars if, among other things, he breached his promise not to

---

[1] Because the settlement agreement was filed under seal, the Court describes its content in general terms in this Order.

2

infringe Adobe's copyrights and trademarks as stated in the settlement agreement. Id. at ¶ 3. In it, Kornrumpf agreed not to advertise, offer for sale, sell or distribute any piratical, counterfeit or Academic or Educational products of Adobe. Id. at ¶ 4. The agreement provided that, for purposes of the agreement only, doing these actions with Adobe's software that is not piratical, counterfeit, Academic or Educational would not constitute a breach of the injunction and would not be grounds for filing of the stipulated judgment. Id. It also stated, "The Agreement is without prejudice to any other valid rights of the Parties." Id.

In the agreement, Adobe and the Software & Information Industry Association (SIIA) made certain warranties and representations, including that they were not aware of any other infringement by Kornrumpf involving counterfeit or Academic or Educational products and that they intended no further legal action or threats thereof against Kornrumpf for such infringement if he abided by the terms of the agreement. Id. at ¶ 8.

The agreement released all claims specifically or generally referred to in the agreement and complaint, including those that could have been brought in the complaint, but excluding any act taking place after the agreement's effective date. Id. at ¶ 9. The agreement also contained an integration clause, stating that it was the entire agreement and understanding between the parties and superseded and replaced all prior negotiations and proposed agreements, written or oral. It also stated that, except for the representations and warranties made in the agreement, no party relied on any statement, representation or promise of any other

3

party in entering into the agreement. Id. at ¶ 16. Finally, the agreement also provided that it was not transferable or assignable, except to the extent that Adobe's and SIIA's rights and responsibilities could be transferred to their successors in the event of a merger or acquisition. Id. at ¶ 18.

The stipulated permanent injunction, which was entered by this Court, similarly provided,

> b) Defendant specifically agrees that he will not now, nor at any time in the future, advertise, offer to sell, sell or distribute any Academic or Educational versions of Plaintiff's software.
>
> c) This Injunction is without prejudice to any other valid rights of the Plaintiff or Defendant.

Case No. 08-5513, Docket No. 27, ¶ 4.

During the settlement negotiations between the parties preceding their execution of the agreement, Kornrumpf's attorney in the earlier action, Michael Miretsky, an attorney at McCurdy & Leibl, LLP, the same firm which currently represents Defendants, communicated to Adobe's counsel that Kornrumpf would only agree to a settlement if he were allowed to continue selling OEM versions of Adobe software products. Miretsky Suppl. Decl. ¶ 5. Miretsky testifies that early versions of the settlement agreement and injunction "included a blanket injunction against Mr. Kornrumpf selling any 'unauthorized products' which were merely defined as any version of Adobe's products not authorized to be sold," but that this was replaced with a list in the final version. Id. at ¶ 7.

On June 12, 2009, during the negotiations between the parties' attorneys prior to the execution of the settlement agreement, Miretsky sent Adobe's counsel, Annie Wang, an email

4

expressing his client's concern about triggering the stipulated judgment, and stating in part

> All our client wants to do is to be able to sell authentic software on his auction site. We are not looking for a license to do that. We are not even looking for a concession that we are permitted to do that under the first sale doctrine. All we want to do is make sure that doing so is not going to violate the injunction and trigger the stipulated judgment. I would propose the following amendment to paragraph 4c:
>
> "Nothing herein shall prevent Defendant from otherwise advertising, selling, offering for sale or distributing Plaintiff's software. For purposes of this Agreement only, advertising, selling, offering for sale or distributing Plaintiff's software on any auction site, shall not constitute a breach of this injunction and shall not be grounds for filing of the Stipulated Judgment. For purposes of this Agreement only advertising, selling, offering for sale or distributing OEM versions of Plaintiff's software shall not constitute a breach of this injunction and shall not be grounds for filing of the Stipulated Judgment so long as Defendant distributes the software together with hardware or peripheral equipment authorized by any valid license or distribution agreement."

Wang Decl. ¶ 3, Ex. B. This particular language was not incorporated in the injunction or settlement agreement.

On June 17, 2009, Wang emailed an Early Neutral Evaluation statement to the parties' neutral evaluator and copied Miretsky on the email. Wang Suppl. Decl. ¶ 8, Ex. D.[2] The document stated in part,

> Adobe also received inquiries from Defendant's customers regarding the legitimacy of Defendant's eBay sales of

---

[2] Defendants object to the admissibility of the statement, arguing that it is hearsay and irrelevant, because the ENE never took place and the email was sent only two days before the execution of the settlement agreement. The Court overrules this objection. First, the email shows that it was sent several weeks before the agreement was signed. Regardless, it is relevant to show what Adobe had communicated to Kornrumpf. It is not hearsay, because it is not offered to prove the truth of the matters stated.

5

> OEM software that appeared to have been sold with items such as photo paper.  While Plaintiff has not yet had an opportunity to fully explore the OEM issues and the origin of those products, it believes Defendant is not operating under any valid distribution agreement or license with Plaintiff or any of its authorized distributors and these OEM sales are also unlawful and in violation of the Copyright Act.

Id.

After the settlement agreement was executed, Kornrumpf returned, to Adobe, software valued at approximately $21,000. Kornrumpf Suppl. Decl. in Opp. to Adobe's Second Motion for Partial Summ. J. (Kornrumpf Suppl. Decl.) ¶ 3.  He retained Adobe OEM software and began relisting it for sale on eBay.  Id.

Several months after the settlement agreement was executed, in October and November 2009, Adobe, through the SIIA, used eBay's notice and takedown procedures to remove several of Kornrumpf's listings of Adobe OEM software.  Kornrumpf Decl. ¶¶ 2-3; see also Wang Suppl. Decl. ¶ 11.  Kornrumpf filed counter-notices with eBay, stating that he had the right to distribute this software. Kornrumpf Decl. ¶ 4.  Pursuant to the procedures set forth in the Digital Millennium Copyright Act, 17 U.S.C. § 512, eBay was required to reinstate Kornrumpf's listings upon receipt of his counter-notices, unless Adobe filed suit.  See 17 U.S.C. § 512(g)(2)(C).

Defendants' counsel, Reagan Boyce, another attorney at McCurdy & Leibl, LLP, contacted Wang to ask why Adobe had filed takedown notices against Kornrumpf's eBay account.  On November 5, 2009, Boyce emailed Wang and stated that she was asking about an auction that was removed on October 29, 2009 for "commercially licensed versions" of a piece of software, "No academic or educational versions."  Boyce Suppl. Decl., Ex. B.  Wang responded

6

on the same day, stating, "'Commercially licensed versions' is too vague for us to make a determination," and asking for additional information "about the product (e.g., OEM, full retail, etc.)?" Id. The next day, Boyce responded, in part, "The software was OEM. Can you please let me know what is the status of getting Mr. Kornrumpf's auction reinstated and/or informing eBay that it was removed in error." Id. Less than a half hour later, Wang responded, "I am following up with the client re your questions." Id. In her declaration, Wang explains that she asked Boyce "multiple times for details about what Kornrumpf was selling as the prior Settlement Agreement did not prevent Defendant Kornrumpf from distributing retail versions or even OEM versions if correctly distributed with the original hardware pursuant to Adobe's licensing restrictions." Wang Suppl. Decl. ¶ 12.[3]

On November 17, 2009, Boyce also sent a letter to eBay, with a carbon copy to Wang. The letter stated, in part,

> Mr. Kornrumpf entered into an agreement with Adobe on June 19, 2009, regarding the sale of Adobe software products by Mr. Kornrumpf. Mr. Kornrumpf agreed that he would not advertise, offer for sale, sell or distribute any piratical, counterfeit, academic or educational versions of Adobe software. Under the agreement, Mr. Kornrumpf's right to sell any other versions of Adobe software, including commercially licensed OEM software, was preserved.
>
> On Thursday, October 29, 2009, at the request of SIIA acting on behalf of Adobe, an auction posted by Mr.

---

[3] Defendants object to this paragraph of Wang's declaration as "improper argument" and under the best evidence rule, stating that Wang failed to attach the email exchange that would show the communications. However, Wang's statement is not argument and instead explains her reasons for her own actions. She does not purport to describe the contents of the email exchange, which Defendants had already offered into evidence. Accordingly, the Court overrules Defendants' objection.

7

> Kornrumpf was removed by eBay. This auction was one of many auctions for the same title of software that SIIA requested be removed. The product offered by Mr. Kornrumpf was not educational, academic, counterfeit or piratical in nature or origin and therefore should not have been removed. . . .

Boyce Decl. ¶ 5, Ex. B. Defendants state that Adobe's counsel did not respond to this letter, or attempt "to 'correct' any misunderstanding." Boyce Decl. ¶¶ 5-6.

For months thereafter, Kornrumpf did not hear anything more about the removal of the listings and assumed that this confirmed his belief that the listing had been taken down in error. Kornrumpf Decl. ¶ 5.

Adobe initiated the instant lawsuit on June 24, 2010.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

8

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it

9

must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

## DISCUSSION

Adobe asks that the Court rule that, as a matter of law, the settlement agreement does not provide an express or implied "carve out" authorizing Defendants to sell OEM software outside of OEM licensing restrictions, as Defendants contend. Adobe acknowledges that, in the agreement, it released claims that could have been brought in the first lawsuit, including past sales of unlicensed OEM software. Adobe thus does not seek damages for such sales before the execution of the settlement agreement.

Defendants oppose Adobe's motion, arguing that, while the settlement agreement does not provide an express authorization, it "implicitly grants Defendants affirmative rights" to sell unbundled OEM software. Opp. at 5. Defendants reason that, "by specifically identifying four types of software to be enjoined" in the settlement agreement and proposed permanent injunction, "plaintiff crated [sic] the inference that any software not enjoined Defendant would be permitted to sell," thereby giving Defendants "informal permission" to sell unbundled OEM software. Defs.' Suppl. Brief at 2-3.

10

Adobe argues, and Defendants do not dispute, that Hoops Enterprise LLC cannot raise this defense, because it was not a party to the underlying agreement. As Adobe points out, even if there were an express or implied grant of rights in the agreement, this would not extend to Hoops Enterprise LLC, because it did not exist at the time of the agreement was executed, see Defs.' Mots. in Limine 5, 8, and was not a party to the agreement. See Settlement Agreement ¶ 18.

Further, this Court finds that there is no material dispute of fact that the settlement agreement and permanent injunction in the prior case did not give Defendants authorization to distribute OEM software outside of the licensing terms.

Under California law, if contract terms are disputed, even where the contract terms appear to the court to be unambiguous, "'the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning.'" First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust, 631 F.3d 1058, 1067 (9th Cir. 2011) (quoting Morey v. Vannucci, 64 Cal. App. 4th 904, 912 (1998)). However, "California law does not permit the use of extrinsic evidence to establish an ambiguity in the parties' intent independent from the terms of the contract; instead, it can only be used to expose or resolve a latent ambiguity in the language of the agreement itself." SCO Group, Inc. v. Novell, Inc., 578 F.3d 1201, 1210 (10th Cir. 2009). If the extrinsic evidence reveals a latent ambiguity and that the contract is reasonably susceptible of the proffering party's interpretation, that evidence must then be admitted to assist in the

11

interpretation of the contract. See First Nat'l, 631 F.3d at 1067; see also Winet v. Price, 4 Cal. App. 4th 1159, 1165 (1992). If conflicting extrinsic evidence supports different interpretations of ambiguous contractual language, this poses a question of fact not amenable to summary judgment. See First Nat'l, 631 F.3d at 1067.

On its face, the settlement agreement appears unambiguous. Kornrumpf agreed that he would not distribute any "piratical, counterfeit or Academic or Educational products" of Adobe. If he did, Adobe could file a stipulated judgment holding him liable for one million dollars. Conversely, if Kornrumpf distributed software that was not piratical, counterfeit, Academic or Educational versions of Adobe's software, that activity would not constitute a breach of the injunction and would not be grounds for Adobe to file the stipulated judgment. Because this agreement did not affect "any other valid rights of the Parties," neither party gained or relinquished any rights that were not specifically enumerated in the agreement. Thus, if Kornrumpf otherwise violated Adobe's separate rights in products not covered by the agreement, such as by distributing OEM software outside of its licensing restrictions, Adobe did not relinquish its right to hold Kornrumpf liable through means other than filing the stipulated judgment, such as by initiating a new court action.

Defendants' proffered extrinsic evidence does not establish that the settlement agreement is ambiguous. Even if it were, it is not reasonably susceptible to the interpretation that they urge. Defendants argue that Adobe knew that Defendants would sell OEM software after the execution of the agreement and thus, by

12

failing to include a specific prohibition of this conduct, implicitly allowed Defendants to do so. Defendants ignore the distinction between selling OEM software bundled with its original hardware, and selling OEM software without its original hardware. The settlement agreement did not affect Kornrumpf's rights to distribute OEM software in compliance with its licensing terms, but neither did it grant him the right to do so outside of those terms. Adobe has consistently taken the position that Defendants' actions were a violation of Adobe's rights because Defendants sold OEM software out of compliance with the licensing restrictions, which required that the OEM software be distributed with specific hardware components, and not simply because they distributed OEM software at all. Further, as demonstrated by their attorney's proposed language, Defendants clearly understood and acknowledged this distinction.

Defendants offer as evidence a declaration from Miretsky that attests to his interpretation of the agreement as including an affirmative "carve-out" allowing Defendants to sell unbundled OEM software. In his declaration, he states,

> The purpose of the carve out provision in the settlement agreement and injunction was to permit Mr. Kornrumpf to sell OEM versions of the Adobe software products. It was the intent of the parties that continued sales of OEM software would not violate Adobe's intellectual property rights. If there was no understanding and agreement by Adobe that Mr. Kornrumpf would continue to sell OEM versions, and only OEM versions, for the Adobe software products, the carve out provision would have been unnecessary.

Miretsky Decl. ¶ 8; see also Miretsky Suppl. Decl. ¶ 8. However, this declaration impermissibly consists of argument and conclusions, and is not limited to facts within his knowledge.

13

1 Miretsky purports to state "the intent of the parties" and "the
2 purpose of the carve out provision" without offering any
3 foundation for his statement of Adobe's beliefs and purposes. Id.
4 Accordingly, the Court sustains Adobe's objections to this
5 paragraph. Further, Miretsky's arguments are not persuasive.
6 Contrary to his contention, the references to "piratical,
7 counterfeit, Academic or Educational versions" are not rendered
8 superfluous by Adobe's interpretation of the agreement and
9 injunction. As explained above, these terms limit the activities
10 that would trigger the filing, without a trial, of the stipulated
11 judgment and accompanying one million dollar liability for
12 Kornrumpf, to only the enumerated types of software, so that Adobe
13 could not use the stipulated judgment to get a judgment
14 automatically against Kornrumpf for misuse of other software
15 types. Miretsky himself recognized the importance of this in his
16 June 12, 2009 email.

17 Defendants further argue that "evidence regarding the months
18 of negotiation and the back and forth discussions between the
19 parties as to what was acceptable, what was agreed upon and how
20 best to achieve the goals of both parties, i.e., the true intent
21 of the parties" supports their construction. However, this
22 evidence does not support their proposed construction. While the
23 parties discussed OEM software during their negotiations, the
24 parties chose in their final agreement not to make specific
25 reference to OEM software. Instead, they stated that the
26 agreement was "without prejudice to any other valid rights of the
27 Parties." Settlement Agreement ¶ 4. Again, this did not give the
28 parties any rights that they did not already have, and Kornrumpf

14

did not have a right to sell unlicensed OEM software either before or after executing the settlement agreement. Further, the language that Kornrumpf's attorney himself proposed for inclusion in the agreement demonstrates that the parties understood that any permissible distribution of OEM software would have to be "together with hardware or peripheral equipment authorized by any valid license or distribution agreement." Wang Decl. ¶ 3, Ex. B.

Defendants next assert that the parties' conduct supports that their interpretation is reasonable. "A party's conduct occurring between execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties understood and intended those terms to mean. For this reason, evidence of such conduct, including concealment of certain information, is admissible to resolve ambiguities in the contract's language." City of Hope Nat'l Med. Ctr. v. Genentech, Inc., 43 Cal. 4th 375, 393 (2008). Defendants appear to suggest that Adobe unreasonably delayed in bringing this suit or in informing Defendants that the agreement did not give Kornrumpf permission to sell unbundled OEM software. The evidence does not permit an inference that Adobe's conduct suggested that the language in the contract was ambiguous, or reasonably susceptible to Defendants' proposed interpretation. Adobe utilized non-judicial procedures, specifically submitting takedown notices to eBay, to address Defendants' actions. Further, in the early neutral evaluation statement, Adobe explained to Kornrumpf the distinction between distributing unbundled OEM software and distributing it in compliance with a valid distribution agreement or license. Kornrumpf, through his attorneys as demonstrated by

15

their emails, evidenced a clear understanding of this difference. Adobe took the time to investigate whether Kornrumpf's distribution of OEM software was bundled properly in compliance with the relevant distribution and licensing agreements.

Finally, Defendants contend that the differences between the injunction entered in the prior case between the parties and injunctions from other litigation involving Adobe demonstrate the parties' intent to grant Kornrumpf the right to sell unbundled OEM software. The only difference between the injunction entered by the Court here and the injunctions entered by other courts is the inclusion of paragraphs 4(b) and (c). The language that this Court used in these paragraphs does not state or imply that Kornrumpf was granted the right to sell unbundled OEM software; instead, the Court's language expressly states, and means, that the parties both retained any "valid rights" as to anything not specifically enumerated. See Lampkin v. Int'l Union, United Auto., Aero. & Agric. Implement Workers, Local No. 1093, 154 F.3d 1136, 1147 (10th Cir. 1998) ("The district judge's interpretation of his own order is, of course, the most authoritative."). If Kornrumpf did not already have a valid right to sell unbundled OEM software, this Court did not grant it to him through those provisions. Defendants' interpretation contradicts the clear statement in the Court's injunction.

Thus, the Court finds that the extrinsic evidence proffered does not disclose any latent ambiguity in the settlement agreement. If the agreement were somehow ambiguous, the extrinsic evidence does not show that it is reasonably susceptible to Defendants' interpretation. If it were susceptible to Defendants'

16

interpretation, and the extrinsic evidence was admitted to show the intent of the parties, it does not raise a material dispute of fact that the parties intended the settlement agreement in the prior case to give Defendants authorization to distribute OEM software outside of the licensing terms. Furthermore, the Court finds that its permanent injunction unambiguously did not do so.

CONCLUSION

For the reasons set forth above, the Court GRANTS Adobe's first motion in limine, which was converted to a motion for partial summary judgment (Docket Nos. 181 and 204).

IT IS SO ORDERED.

Dated: 6/15/2012

CLAUDIA WILKEN
United States District Judge

17